Green, J.
delivered the opinion of the court.
This bill was filed by the State to repeal certain'grants which have been issued to the Universities'for lands in the Ocoee District, which lands were entered by the defendants under the law opening the entry taker’s 'office, in that District.
The act of 1837-8, ch. 2,.sec. 5, provided, that the entry taker’s office should be opened on the first Monday of November, 1838, for the reception of entries by “all and every person or persons, except natives of the Cherokee nation of Indians, who was or were in the actual possession of and residing upon any piece of vacant and unappropriated land in said district, at the time of the passage of” said “act, or his or their rightful assignee or assignees,” should, “for the space of three months after the opening of said office, be entitled to a preference or priority of entry, for one hundred and-sixty acres of land, so as to include his, her or their improvement and dwelling house,” &c. for which they should pay seven dollars and fifty cents per acre. After the expiration of the aforesaid term of three months, all the vacant lands were to be subject, for the space of two months, “to the entry of all and every, 'person or persons wishing to make the same,” at the same rate of seven dollars and fifty cents per acre. After- the expiration of the said two months, occupants were to-be again entitled- to a preference of entry for another term of two months, at five dollars per. acre. And after thé expiration of said last term of two months, all the unappropriated land was *161 to be subject for the space of two months to the entry of “all persons who” might “choose to enter the same,” at the said price of five dollars per acre. After the expiration of said two months, the price was to be graduated in the same way every two months, first in favor of occupants, and then-subject to the appropriation of the general enterer; reducing the price, first to two dollars, then to one, then to fifty cents, then to twenty-five cents, then to twelve and one half cents, and lastly to one cent per acre.
The act of 1837-8, ch. 196, sec. 1, directed the entry taker of the Ocoee District, before the time of opening the office should arrive, to select and designate upon the plan of the district, the two half townships of land, which had been reserved by law for the use of colleges and academies; and declared that the money arising upon the entry of said land should be paid over to the trustees of East Tennessee College and Nashville University, in equal proportions, upon their agreeing to receive the same in full satisfaction of all claims which they had against the State, or the citizens south of French Broad and Holston rivers.
The bill alledges, that the trustees of the Colleges did agree to receive the proceeds of the said lands in lieu of the claim they had upon the people south of French Broad and Holston; and that certificates of release had been filed as the acts of 1829 and 1836 piovide. It alledges that two half townships were designated for the colleges by the entry taker; and that when the office opened, a part of the land contained in them was sold at seven dollars and fifty cents per acre, and the proceeds of such sales were paid over to the trustees of the colleges; and that when the time arrived that said lands were subject to be appropriated by general enterers at five dollars per acre, the trustees of East Tennessee College and Nashville University tendered locations of all the remainder of the said two half townships of land, amounting to twelve thousand three hundred and twenty acres, at the said price of five dollars per acre, and that the entry taker received the same, although no money was actually paid, as the law required. Grants have issued to the corporations aforesaid, for all the said lands, and the colleges *162 have sold the same to Luke Lea, the entry taker, for the price of seventy-five cents per acre. The bill insists that the entries aforesaid were illegally made, and that the grants illegally issued; and prays that the same may be declared null-and void, and that the conveyance of the colleges to Luke Lea be declar-r ed void. •
To this -bill there is a demurrer. The questions now raised and debated by the Attorney General, are, first, whether by the terms of the law opening the land office for the reception of entries, corporations are not excluded; and, second, whether the nonpayment of the price of the land in cash, a-t the time the entries were made, does not make void the. .entries, and the grants issued thereon. Both of these questions are necessarily involved and decided by this court, in the case-of Everette vs. Lea. In that case, Leabrought an action of ejectment against Everette, who was in possession of a quarter section of the land entered by the colleges and sold to Lea: Everette was in possession of •the said land at the passage of the act to dispose of -the-lands in the .Ocoee District, passed the 29th of November, 1837,- and was consequently entitled to a preference of entry according to the terms of that act; but he had not entered the land.at seven dollars and fifty cents per acre, nor -had he attempted to enter it at five dollars per acre, until after the time, within which occupants had the preference,.expired. All the. facts which are set forth in this bill were stated in the agreed case' of Everette vs. Lea, and consequently the .questions now-before the court were determined in that case. In that case this court said, in the opinion delivered by T.urley, Judge: “Now the question for the consideration of the court; is, are the grants issued by the State of Tennessee to the Nashville University and East Tennessee College, void, so as to pass, no- title under which the lessor of the plaintiff can maintain-this action? -The solution of this question depends upon the construction of the statutes by which, these universities were incorporated,- as to the power granted them of acquiring and holding real estaté.
“By the act of 1806, ch. 7, sec. 2, the Nashville Universityis empowered . to have, receive and enjoy lairds, tenements and hereditaments, of every kind or value, in fee, or forlife, or years.
*163 “By the act of 1807, ch. 64, sec. 1, the East Tennessee College is empowered to purchase, receive, and hold to them and their successors, forever, or for any life estate, any lands or tenements, which shall he given, granted, or devised to or purchased by it. • Under the provisions of. these two statutes, no one can doubt that full and ample authority is conferred upon these universities to ácquire and hold, in their corporate capacity, real estate, by gift or purchase, in as ample a manner as individuals might or could under the law. This proposition is so self-evident, that argument or illustration cannot make it plainer-. If these universities might acquire and hold lands from private individuals, by gift, devise or purchase, is there legal' ground for saying that they may not from a State? None whatever that we can see.
“By the act of 1837, ch. 2, the State of Tennessee offered the dands in the Ocoee District for sale, under the rules and restrictions therein contained. Under its provisions, the lands in controversy were entered by theNashville University andEastTen-nessee College, and grants have been issued to them'. But it is said, that they had no right to enter these particular lands, because they are a portion of the two half townships directed to be set apart in the Ocoee District, by act of 1838, ch. 196, for the Nashville University and East Tennessee College, the proceeds of which were to be equally divided between them, the lands being to be disposed of under the provisions of the statute regulating the disposition of the lands in the Ocoee District. That is, that inasmuch as the proceeds are directed to be divided, no right to enter these lands could exist in the universities, because the two rights are inconsistent. The result of this argument is, that the universities are prevented from entering these particular lands by an implied prohibition. It is contended on the part of the universities, that the legislature haul no power to prohihit them from entering these or any other lands in the State subject to entry, because it would be a violation of their corporate privilege. We are not prepared to go this length,- for though we' concede that the legislature has no constitutional power to infringe upon the rights granted by the charters of. incorporation, one of which is to acquire and hold lands and ten *164 ements by gift or purchase, yet we do not see buL that die State in offering its public domain for sale, majq by express provision, exclude corporations from becoming purchasers thereof, if in their opinion the public good requires it, as they may an individual, who is already the owner of land or lands, or joint stock companies. The legislature being the guardian of the republic have this power, to prevent a monopoly of the public lands and a perpetuity of title. But the question here is, has the legislature created this prohibition as to the universities? We think not. That it is not express is self-evident. And the direction, that the proceeds of the sales of the lands, specified in the act of 1838, shall be divided between them, does not, as we conceive, by any possible rule of construction, amount to such prohibition by implication. It is true, that inasmuch as these lands were to be disposed of by the provisions of the act establishing the Ocoee District, the universities had no direct interest in the soil; and, therefore, an occupant was entitled to a preference of entry, and an elder entry by an individual would be good against a younger entry by the universities; but there is no controversy with occupants, who have a right as such to contest the entries, or elder enterers at the time these entries were made by the universities. The land was then vacant and unappropriated, and there were no occupant preferences to conflict therewith. The objection, that the money price vras not paid by the universities at the time of the entry, amounts to nothing, because, first, the money belonged to them; and if they had paid it, they would have been entitled to demand it again immediately from the entry taker: and, second, because if the purchase money be not paid, it does not make the entry and grant void ab initio, and is a thing which cannot be inquired into in a controversy between the grantee and a third person. It is, at most, a neglect of duty on the part of the officer of gov-vernment, for which he is personally responsible; and so far as the grantee is concerned, can only amount to a cause for a repeal of the grant on the part of the State by scire facias, or in any other judicial manner that may be prescribed by the legislature.”
These positions have been combatted by the Attorney Gen *165 eral to some extent; and we have listened patiently, and weighed deliberately the arguments that have been urged, anxious to correct any error into which we may have fallen. But after the most mature reflection we are confirmed in the views already expressed by this court.
It is not now controverted, but that these corporations are empowered to purchase and hold lands without limit, by their charters; and having power to purchase from individuals, it is not questioned but that they may purchase and hold lands from the State. But it is said, the State had a right to refuse to sell to them, and that in this instance the office was opened only to natural persons, by the act of 29th November, 1837. It is conceded, in the opinion in the case of Lea’s lessee vs. Everette, that the State would have had a right to exclude any class of purchasers the legislature might have chosen to designate, so that the exception should have the character of a general law, and, consequently, corporations might have been excluded from the privilege of making entries. But the question is, does the act of assembly contain ' any such exclusion? It is not pretended it does in express terms, but it is insisted the word person used in the act, was intended to apply to natural persons alone, and that corporate bodies are excluded by implication. Angelí & Ames on Corporations, p. 3, adopt the language of Mr. Kyd and define a corporation to be a political person, capable, like a natural person, of enjoying a variety of franchises. Kyd on Corporations, p. 15. The language of the act opening the office for entries In this case is: “and after the expiration of the said term of two months all the land lying in said district remaining unappropriated shall, for the space of two months, be subject to general appropriation by all persons who may choose to enter the same,” The word persons could not have been used in a larger sense, by any phraseology with which it could have been connected. If, therefore, there is nothing in any other part of the act by which the intention is manifest to exclude corporations, they are certainly included in the word persons as used. But it is not insisted that the argument, that corporations are excluded, gains any strength from a reference to other parts of the act: it assumed, however, that although corporations are po *166 litical persons, and are included in all legal enactments where duties and disabilities are imposed upon persons, yet they should be excluded from the meaning of the word where a benefit is to be obtained. No authority, however, has been produced, where such distinction has been made in the sense of the word.
The words “inhabitant,” “person,” or “occupier of land,” all include corporations, where a tax is levied, a highway to be constructed, a bridge to be built, &c. Angelí & Ames on Corporations, p. 257, et seq. The Supreme Court of New-York decided, that under the act for the assessment and collection of taxes, corporations are liable to be taxed for the property owned by them; though the act speaks only of persons liable to be assessed, and corporations are not named. 15 John. Rep. 782. Our act of 1794, ch. 1, that authorizes any person or persons, being a creditor, to take out an attachment against an absconding debtor, was held by this court, in the case of the Bank of Alabama vs. Berry, 2 Hum. R. 443, to apply to corporations that are creditors, and so we understand the attachment laws to have been constantly construed. There is no ground, therefore, in reason, or authority, for the distinction the Attorney General seeks to establish, between the meaning of the word person, as applied to corporations, and where disabilities and duties are imposed on the one hand, and where benefits are conferred on the other; and unless the distinction can be found in the context, and which is not pretended in this case, it does not exist at-all. But it is earnestly insisted, that the payment of the money to the entry taker was a condition precedent to the entry, and as no cash was actually counted, and placed in the hands of the entry taker, the entry and grant are illegal and void. In addition to what is said in Leah's lessee vs. Everette, it may be remarked, that as by the law the universities were entitled to the proceeds of these lands, and would have had aright to demand the money the moment it was received by the entry taker, it would have been a very useless thing to have gone through the ceremony of this double payment. If a natural person had been so situated towards the State, and had made entries as these defendants have done, it would hardly have been conceived by any one, that the failure to go through the ceremony of paying *167 ibe money to the entry taker, that it might be immediately paid back to the enter'er, would have been necessary. The State is debtor to an individual, and in discharge of that debt enacts a law, that the entry taker shall lay off a section of land for his benefit, and whenever it shall be e'ntered, shall páy him the proceeds: occupants fail to enter the land during the period for which they have a preference; and so soon as it is subject to the general enterer, the person thus entitled to the proceeds comes and enters the land, and gives his receipt to the entry taker for the proceeds. Here all that the law required should be done, was in substance performed; but the money required to be paid was not in fact counted and delivered to the entry taker. It would doubtlessly be thought' exceedingly absurd, in such a case, to hold that the grant which afterwards issued was illegal and void. And yet the case supposed is in substance the case now before the court. Or, take the case of an entry made by any person whatever; of a quarter of a section, and the omission to pay the móney to the entry taker until after the entry was made, but the money is subsequently paid, and the grant issues, would any .one, for a moment, suppose that the State could annul and make void the grant,- as having illegally issued? Surely not. And yet, such case would be exposed to the full force of the argument which is urged in this case: for the argument is, that the money must be paid as a condition precedent to making the entry, and if it be not done, the entry is illegal, the grant is illegal, and the whole procéedings should be annulled and declared void. But more especially do we regard the ceremony of payment and re-payment as immaterial, when the rights of the parties are litigated in a court of chancery. Equity looks at the substance, and not at the form of things. .The substance of the thing is, that the. party entitled should receive the proceeds of the sale of the land 'on the one part, and that those who were entitled to acquire- lands by entry should be clothed with the legal title thereto. This has been done. Had other persons made the entries, the State would have been precisely in the same situation it now occupies on the one hand; and the colleges having received the proceeds, would • have stood as they now do on the other. Upon what ground, then, *168 is a court of equity called upon to annul what has been done, and to place the parties in statu quo? So far as the parties to this suit are concerned, things have resulted, and are, in substance, precisely as they would have been, had the transaction assumed the form for which the Attorney General contends.
But it is argued by the gentleman associated with the Attorney General in this cause, that the colleges, having elected to take the proceeds of these lands according to the offer on the part of the State, contained in the act of the 26th of January, 1838, they were bound by this election, and could not, after-wards, claim the lands in specie, by virtue of the acts of 1829 and 1836. The correctness of this proposition is not controverted by the counsel for the defendants. But it does not affect the questions upon which the case depends.
The colleges do hot seek to abandon their election, and to claim the lands in specie, by virtue of the previous act of assembly upon the subject. On the contrary, they come into the market as other general enterers, and claim the right as “'persons,” to enter and obtain grants for land, as natural persons might do. Had they entered lands, to the proceeds of which they were not entitled, they would have been compelled to pay for it, as other enterers were required to do. But having entered the lands that were laid off for their benefit, and- to the proceeds of which they were entitled, they' insist that the formal payment of the money to the'entry taker, and the receipt of it back immediately, was not essential to the validity of their entries and grants; and that they are entitled to the lands, not claiming them,in specie, by virtue of any former acts of assembly,but holding them as general enterers under the law to dispose of the lands in the Ocoee District.
We think there is no just objections to the validity of their title, and affirm the decree of the Chancery Court.